# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00350-CV

**Jack Weatherford, Appellant**

**v.**

**The City of San Marcos, Texas; David Chiu; Jane Hughson; Louis Doiron, Jr.; Earl Moseley, Jr.; Joe B. Cox, Jr.; Paul Mayhew; and Martha Castex Tatum, Appellees**

---

**FROM THE DISTRICT COURT OF HAYS COUNTY, 22ND JUDICIAL DISTRICT NO. 2001-0406, HONORABLE WILLIAM E. BENDER JUDGE PRESIDING**

---

## O P I N I O N

In this cause, we are confronted with a dispute between a property owner, his neighbors, and a city over the property owner's attempts to develop his property for commercial purposes. The property owner, Jack Weatherford, his neighbors, and the City of San Marcos met, negotiated, and agreed in principle that some commercial development of Weatherford's property was possible. Weatherford's subsequent rezoning requests, however, were denied. He sued the City of San Marcos and the City Council (collectively, the "City"), claiming their denials violated his rights to due process and equal protection, violated chapter 245 of the government code, constituted a regulatory taking, and were proprietary in nature and thus subject to estoppel. The City moved for summary judgment arguing that the negotiated land-use plan established only the basic framework

for future development and did not formally vest in Weatherford the right to develop his property commercially. The district court granted summary judgment for the City, and we affirm.

**Procedural and Factual Background**

Weatherford owns about fifty acres in the City of San Marcos. He bought a large tract in the early 1960s, and two smaller tracts in about 1981 and 1995. When Weatherford bought the first tract of land, the property was not within the City's boundaries and was not subject to zoning. The property was annexed and brought into the City in the early 1970s, and since being annexed has always been zoned for single-family residential use. The property adjoins and is surrounded by other single-family tracts, and nearby subdivisions are low-density developments. For the past several years, Weatherford has sought on numerous occasions to have portions of his property rezoned to allow for the development of multi-family residential and commercial projects. His neighbors have consistently opposed these efforts. During this time, the City was in the process of updating its comprehensive land-use plan.[1] The updates set out guidelines for the future development of all property located in the City, which was divided into eight sectors. Weatherford's property lay in Sector II, which encompassed approximately 800 acres. Because the use of Weatherford's property needed to be addressed before a development plan for Sector II was designed, the City hired a neutral third party to facilitate negotiations between Weatherford and his neighbors, and in November 1997, Weatherford, the Director of the City's Planning and Zoning Commission ("the Commission"),

---

[1] The purpose of a comprehensive land-use plan is to provide for the "long-range development of the municipality" and may be "used to coordinate and guide the establishment of development regulations." Tex. Loc. Gov't Code Ann. § 213.002 (West Supp. 2004-05).

2

Commission staffers, urban planners, neighborhood residents, and several other participants attended a "mediated design workshop." Those opposing any future development of Weatherford's property were concerned that the development would create more traffic and change the character of the neighborhood. The workshop resulted in a written agreement, the "Mediated Resolution," contemplating some future multi-family and commercial development of Weatherford's property.

In December 1997, the City adopted the "Sector II Plan" (the "Plan"), which incorporated the Mediated Resolution. *See* City of San Marcos, Tex., Code of Ordinances No. 1997-74 (1997). The Plan stated several objectives, including the development of "a future land use map for the area" and guidelines to ensure that development would be sensitive to existing uses, and the strengthening of community relations "by fostering a partnership between the City and neighborhood residents, property owners, institutions and businesses." *Id*. One part of the Plan was devoted entirely to Weatherford's property, but all development was to proceed through the normal zoning process and Weatherford was required to submit Planned Development District (PDD) zoning applications before any development could begin.[2] *Id*.

---

[2] The Plan does not define "Planned Development District," and there is nothing in the record to show whether the phrase was defined at the time the Plan was enacted. We note generally, however, that cities use planned development districts as an alternative to traditional zoning:

> PDD procedures allow developers to obtain site-specific approval for developments that may not fit standard area and use zoning categories and that require specific negotiation to ensure that community interests are protected. PDDs conventionally accommodate designated types of major development, such as apartment projects, cluster housing, office developments, shopping centers, and hospital facilities.

John Mixon, James L. Dougherty, Jr. & Brenda N. McDonald, *Texas Municipal Zoning Law*, § 7.100 (3d ed. 1999).

3

Over the next few years, Weatherford filed several PDD applications with the Commission to develop his property pursuant to the Plan. The first PDD application was submitted about twenty months after the Plan was enacted and requested the rezoning of 30.66 acres from residential to commercial, multi-family, and duplex residential. The Commission's Assistant Director of Planning recommended approval of the application, stating:

> The requested land use acreages and densities were established as a result of the mediated workshop settlement during the sector two planning process. . . . The proposed PDD plan appears consistent with the land uses indicated in the mediated settlement with one exception. The PDD plan indicates 3.8 acres of duplex development. While [duplex development] is consistent with the 7 acres of 6-12 units per acre density allowance, duplex was not indicated as a future use on the settlement plan.

In September 1999, the Commission considered Weatherford's first PDD application. There was public opposition, and the Commission recommended denial of the application.[3] In December 1999, the City Council heard arguments for and against Weatherford's application. Opponents voiced the same concerns raised at the workshop in 1997, that the development would lead to substantial increases in traffic and an undesirable change in the character of the neighborhood, and Weatherford's first PDD application was denied.

In February 2000, Weatherford filed a standard, non-PDD application seeking the rezoning of 18.6 acres (hereafter "first rezoning application"). After the Commission recommended

---

[3] The Commission's role is to hold public hearings and make a final report to the governing municipal body. *See* Tex. Loc. Gov't Code Ann. § 211.007(b) (West 1999). The governing body can require that it may only overrule the Commission's negative recommendation by a vote of three-fourths of the governing body's members. *See id.* § 211.006 (West 1999).

its denial, Weatherford requested to withdraw the application. The Commission honored his request and the application was withdrawn. In July 2000, Weatherford filed a second PDD application, and the Commission recommended approval. However, Weatherford, through conversations with City officials, believed that his application would be denied and again sought to withdraw the application in a letter dated August 25, 2000.

In September 2000, Weatherford filed a second non-PDD application to rezone 18.6 acres (hereafter "second rezoning application"). In a letter dated November 7, 2000, addressed to Mayor David Chiu and the City Council, Weatherford urged the adoption of his second rezoning application. The next day, however, Weatherford sent Chiu and the Council another letter in which he said he wanted to withdraw the previous day's letter. He also said, "I believe that the City should honor what was agreed to and passed . . . in the Sector II Plan in connection with the 54 acres that I own. I do not believe that I should have to accept anything less than what has already been approved." He asked that his second rezoning application be "removed from the November 13, 2000, agenda and that the City not vote on the land use proposal at this time."

The City removed Weatherford's second rezoning application from the November 13 agenda but then placed it on the December 11, 2000 agenda. Weatherford wrote a letter to Chiu, stating, "My letter, dated November 8, 2000, established quite clearly that my November 7, 2000 request to have the amended land use proposal regarding eighteen acres of my property adopted was withdrawn in all respects." He asked that his second PDD application, which he requested to be withdrawn in August 2000, be placed on the agenda in place of his second rezoning application. He

5

closed the letter with the statement that if the City Council considered his second zoning application and not his second PDD application, he would "consider all remedies available to me."

Weatherford's second rezoning application remained on the agenda for the December 11, 2000 City Council meeting, but when it came up for discussion, the Council unanimously voted to table it. The Council then adjourned and went into executive session "pursuant to the Government Code, Section 551.071, to seek the City Attorney's advice regarding the Weatherford future land use plan amendment."[4] When the City Council reconvened a few minutes later, Mayor Chiu made this statement:

> This Friday, December 15, 2000, will be the third anniversary of the City Council's adoption of the Sector 2 Plan. The City Charter provides for the Planning and Zoning Commission to hold public hearings and make recommendations to the City Council regarding the land use element of the master plan once every three years. The City Council would like for the process for review of the land use element of the Sector 2 Plan to be undertaken and completed as soon as possible by the Planning and Zoning Commission, with involvement of all Sector Two Stakeholders. The Commission may wish to consider any changed circumstances it finds within Sector 2 itself, and in nearby areas of other sectors, in making its recommendations. In light of this direction to the Planning and Zoning Commission, the Council wishes to withhold final action on [Weatherford's] pending land use amendment, LUA-00-03, and table the amendment until the recommendations of the Planning and Zoning Commission are received.

The City Council then tabled consideration of Weatherford's second rezoning application.

Weatherford filed a third PDD application "under protest" in early 2001. This application was intended to duplicate his second PDD application that the Commission had approved

---

[4] Section 551.071 allows a governmental body to "conduct a private consultation with its attorney" when seeking advice about "pending or contemplated litigation." Tex. Gov't Code Ann. § 551.071 (West 2004).

but Weatherford withdrew before City Council consideration. The Commission at the time was composed of only eight members due to the recent resignation of its chairman, and its vote on the third PDD application ended in a four-to-four tie. At the urging of the City Attorney, the Commission placed the third PDD application on its agenda for the next meeting. The City Attorney also advised the outgoing chairman that he could participate in Commission meetings and vote because the chairman retained *de facto* authority pending the appointment of his replacement. The Commission tabled consideration of Weatherford's application by a six-to-three vote.

On July 23, 2001, the City Council passed a revised Sector II Plan (the "Revised Plan"). The Revised Plan reduced the acreage Weatherford could develop as multi-family residential and enlarged the acreage he could devote to single-family residential. The Council then denied Weatherford's third PDD application, drafted pursuant to the original Sector II Plan.

Weatherford sued the City for declaratory and injunctive relief. He complained that: (1) the City's treatment of his various applications violated his rights to equal protection and due process; (2) the City and the individual defendants violated the Open Meetings Act[5] ("the Act") by going into executive session on December 11, 2000; (3) it was improper for a resigning Commission member to have voted on his third PDD application;[6] (4) the City should be estopped from denying his applications because the City acted in a proprietary, not governmental, capacity in passing the original and revised Sector II plans; (5) he was entitled to have his applications approved because

_____

[5] Tex. Gov't Code Ann. §§ 551.001-.146 (West 2004),

[6] Weatherford does not raise this issue on appeal.

7

they were actually "permits" under chapter 245 of the government code; and (6) the City's failure to approve his applications constituted a regulatory taking.

The City filed three motions for summary judgment. The first was a traditional motion for partial summary judgment on Weatherford's claims of violations of the Open Meetings Act. *See* Tex. R. Civ. P. 166a(c). The second was a no-evidence motion for partial summary judgment on Weatherford's claims of the equal protection and due process violations. *See id*. 166a(i). The third was a traditional motion, contesting all issues raised by Weatherford. The City contended that Weatherford's equal protection and due process rights had not been violated because the City's treatment of his applications was reasonable. It also challenged Weatherford's standing to sue under the Act and argued that there was no violation of the Act. The City further argued that Weatherford had no absolute right to withdraw his second rezoning application, the City's actions were not subject to estoppel, Weatherford's applications were not permits that must be approved, there was no regulatory taking, and the individual council members were entitled to governmental immunity. The trial court granted summary judgment without specifying the grounds.

On appeal, Weatherford argues that: (1) the City's denials of his PDD applications were arbitrary, capricious, and unreasonable; (2) the City violated his equal-protection rights by allowing him to withdraw his first rezoning application, refusing to consider his second PDD application on grounds that he had withdrawn it, and then considering his second rezoning application in spite of his requests that it be withdrawn; (3) the City violated the Act in its December 11, 2000 meeting; (4) the passage of the sector plans was a proprietary function and, therefore, the City is not entitled to governmental immunity; (5) the City violated chapter 245 of the local

government code; (6) the denial of his PDD applications constituted an unconstitutional regulatory taking; (7) the City should be enjoined from violating the Act and from considering Weatherford's PDD applications under the Revised Plan; and (8) the individual council members were not entitled to immunity.

## Standard of Review

The City filed both traditional and no-evidence summary judgment motions. *See* Tex. R. Civ. P. 166a(c), (i). We make inferences, resolve doubts, and view the evidence in the light most favorable to the nonmovant. *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222 (Tex. 1999). When an order granting summary judgment does not specify the grounds on which it was granted, we will affirm the judgment if any of the movant's theories are supported by the evidence. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989).

A party moving for a traditional summary judgment bears the burden of establishing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Steel*, 997 S.W.2d at 222. A defendant seeking summary judgment must negate at least one essential element of plaintiff's theory or establish every element of an affirmative defense. *Id.* at 223; *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991).

A no-evidence summary judgment is essentially a directed verdict granted before trial, and a no-evidence motion asserts that no evidence exists as to at least one essential element of the nonmovant's claims on which the nonmovant would have the burden of proof at trial. *Jackson v. Fiesta Mart*, 979 S.W.2d 68, 70-71 (Tex. App.—Austin 1998, no pet.). A no-evidence motion for summary judgment is properly granted if the nonmovant fails to respond with more than a scintilla

9

of probative evidence raising a genuine issue of material fact. *Id*. If the proffered evidence would enable reasonable, fair-minded persons to differ in their conclusions, more than a scintilla of evidence exists. *Id*. at 71. If the evidence does no more than "'create a mere surmise or suspicion' of fact," less than a scintilla of evidence exists. *Id*.

**Analysis**

***Equal Protection and Due Process Claims***

Weatherford argues that his equal protection rights were violated and his fundamental property rights infringed when the City allowed him to withdraw his first rezoning application and second PDD application but denied a similar request to withdraw his second rezoning application. He also argues that his fundamental property rights were harmed when the City Attorney advised the Commission that it could reconsider Weatherford's third PDD application after the first vote ended in a tie. Weatherford contends that the City had to show that its disparate treatment of the applications was "narrowly tailored to serve a compelling governmental interest."

Weatherford has not pleaded a true equal protection claim. An equal protection claim "requires that the government treat the claimant different from other similarly-situated landowners." *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 939 (Tex. 1998). Weatherford does not claim that he was treated any differently than any other City landowner, but only that he himself was treated differently at different times during his application process. *See id*. Moreover, Weatherford had no vested property right in any particular zoning classification. *See City of Univ. Park v. Benners*, 485 S.W.2d 773, 778 (Tex. 1972); *City of San Antonio v. Arden Encino Partners, Ltd.*, 103 S.W.3d 627,

10

630 (Tex. App.—San Antonio 2003, no pet.); *Williamson Pointe Venture v. City of Austin*, 912 S.W.2d 340, 343 (Tex. App.—Austin 1995, no writ).

The PDD application process did not vest any property rights in Weatherford because the PDD approval process remained a legislative act subject to the discretion of the City. The results of the workshop were incorporated into the Sector II Plan, which was to serve as a *guide* for future development. *See* City of San Marcos, Tex., Code of Ordinances No. 1997-74 (1997). It did not rezone any property but instead set out a list of permitted uses. *See id.* The Plan expressly stated that applicants still had to go through the zoning process for approval: "All uses permitted in the table shown above shall be implemented through the submittal of one or more Planned Development District (PDD) zoning cases." *Id.* Weatherford's PDD applications were in essence rezoning applications and were subject to the legislative process used by the City in reviewing any other rezoning request. *See City of Pharr v. Tippitt*, 616 S.W.2d 173, 175-76 (Tex. 1981); *see also* John Mixon, James L. Dougherty, Jr. & Brenda N. McDonald, *Texas Municipal Zoning Law*, § 7.104 (3d. ed. 1999) ("[a]doption or rejection of a PDD by ordinance amendment is, by current Texas and Fifth Circuit law, a legislative act"). Zoning is a governmental function that allows "a municipality, in the exercise of its legislative discretion, to restrict the use of private property." *City of Brookside Village v. Comeau*, 633 S.W.2d 790, 792 (Tex. 1982); *see Mayhew*, 964 S.W.2d at 933 ("Zoning decisions are vested in the discretion of municipal authorities; courts should not assume the role of a super zoning board."); *City of Round Rock v. Smith*, 687 S.W.2d 300, 302-03 (Tex. 1984) ("plat approval is a governmental function").

11

Weatherford further argues that the City's decisions to deny his applications were "arbitrary, capricious and unreasonable" and did not bear a substantial relationship to public health, safety, morals, or general welfare. He claims that the City's denials of his applications were arbitrary and capricious because his applications complied with the land uses and densities agreed to during the workshop in 1997. He also argues that there is no evidence that the City cited concerns for the public health, safety, morals, or general welfare in denying his applications.

To comply with substantive due process, zoning decisions need only be "rationally related to legitimate government interests." *Mayhew*, 964 S.W.2d at 938. We "should not set aside a zoning determination for a substantive due process violation unless the action 'has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare.'" *Id.* at 938 (quoting *Nectow v City of Cambridge*, 277 U.S. 183, 187-88 (1928)). As the nonmovant in a no-evidence motion for summary judgment, Weatherford had the burden of overcoming the presumption of validity of the City's conduct in the exercise of its legislative authority and proving the City's conduct was unreasonable. *City of Pharr*, 616 S.W.2d at 176. If reasonable minds could differ as to whether the City's zoning action had a substantial relationship to the public health, safety, morals or general welfare, the action must stand as a valid exercise of the City's police power. *See Mayhew*, 964 S.W.2d at 938; *City of Waxahachie v. Watkins*, 275 S.W.2d 477, 481 (Tex. 1955).

The minutes from the various City Council meetings show extensive discussions about the effects of urbanization on the surrounding neighborhood. Weatherford claims that the City Council did not cite the ill effects of urbanization as reasons for denying his applications, but the

record indicates that such opposition to Weatherford's development was expressed each time his applications were considered. For example, the minutes of the December 13, 1999 meeting show that Weatherford's neighbors voiced their concerns about increased traffic, increased pollution, changing the character of the neighborhood, urban sprawl, drainage problems, utilities problems, and changes in their quality of life for those in the affected area. It is apparent that the basis for the City Council's action was the significant public opposition to Weatherford's requested development. In short, the City's decisions to deny Weatherford's PDD applications were rationally related to the general welfare; namely, protecting residents from the negative impact of urbanization and maintaining quality of life. *See Mayhew*, 964 S.W.2d at 938-39. We conclude that Weatherford presented no evidence that the City acted in an arbitrary and capricious manner when it rejected Weatherford's rezoning applications.

Weatherford also argues that the City's refusal to withdraw his application to rezone was arbitrary and capricious and that the City acted in an arbitrary and capricious manner in allowing the city attorney to place Weatherford's third PDD application back on the Commission's agenda after the first vote ended in a four-to-four tie. Once the application was placed back on the agenda and nine members were allowed to vote, the Commission voted to table the application pending changes to the Plan. Weatherford argues that as a result he was denied the opportunity to have his application evaluated under the original Plan.

At best, Weatherford's complaint is that the procedure used by the City was unfair. However, "this is not the proper inquiry." *Id*. at 939. "Zoning is a legislative act," and in making zoning determinations, a municipality "is entitled to consider all the facts and circumstances which

13

may affect the property, the community, and the welfare of its citizens." *Id*. at 939-40. To satisfy procedural due process, the City need "only provide notice and an opportunity to be heard." *Id*. at 939. Weatherford had both notice and an opportunity to be heard and had no right to have any of his applications approved—whether under the original Sector II Plan or the Revised Plan. We overrule Weatherford's first and second issues.

### *Violations of Open Meetings Act and Injunctive Relief*

Weatherford alleged that the City Council violated the Open Meetings Act when it went into executive session during the City's regular council session on December 11, 2000. *See* Tex. Gov't Code Ann. §§ 551.001-.146 (West 2004) (the "Open Meetings Act," hereafter "the Act"). The record indicates that Mayor Chiu was "advised" to go into executive session pursuant to section 551.071 of the government code, which allows a governmental body to convene a closed session to seek its attorney's advice about "pending or contemplated litigation." *See id*. § 551.071. Weatherford argues that this announcement was at odds with the meeting's notice, which stated that "the City Council may adjourn into Executive Session to consider any item listed on this agenda if a matter is *raised* that is appropriate for the Executive Session discussion." (Emphasis added.) He contends that there was no "pending or threatened" litigation and, even assuming there was, the matter was never "raised" during the course of the open meeting.

Generally, meetings of governmental bodies must be open to the public. *See id.* § 551.002. "Actions" taken in violation of the Act are voidable. *Id*. § 551.141. A governmental body, however, may meet with its attorney in private to discuss "pending or contemplated litigation." *Id*. § 551.071. Before closing a meeting, the presiding officer must publicly announce an intent to

14

go into a closed meeting and identify the statutory basis for doing so. *Id.* § 551.101. The Act does not prohibit the expression of opinions in a closed session, as long as the actual vote or decision is made in an open session. *Thompson v. City of Austin*, 979 S.W.2d 676, 685 (Tex. App.—Austin 1998, no pet.).

The Act also requires advanced written notice of all meetings held by a governmental body. Tex. Gov't Code Ann. § 551.041. The notice requirements also apply to executive sessions, and the notice must be sufficiently specific to alert the general public to the topics to be considered. *Cox Enters., Inc. v. Board of Trustees*, 706 S.W.2d 956, 958 (Tex. 1986). "As long as a reader is alerted to the topic for consideration, it is not necessary to state all of the consequences which may flow from consideration of the topic." *Id*. The notice provision is intended to provide public access to and increase public knowledge of government decisionmaking. *City of San Antonio v. Fourth Court of Appeals*, 820 S.W.2d 762, 765 (Tex. 1991). "The Open Meetings Act is not a legislative scheme for service of process; it has no due process implications. Rather, its purpose is to provide 'openness at every stage of'" governmental deliberations. *Id*. (quoting *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 300 (Tex. 1990)). In reviewing a notice under the Act, we should ensure that those purposes are served, but the notice need not be "tailored to reach those specific individuals whose private interests are most likely to be affected by the proposed government action. . . . If a 'reader' is given notice, the requirement of the Act is satisfied and its purpose served." *Id*. If the contents of a notice are undisputed, its adequacy is a question of law. *City of San Angelo v. Texas Natural Res. Conservation Comm'n*, 92 S.W.3d 624, 629 (Tex. App.—Austin 2002, no pet.).

The notice at issue stated that the Council intended to:

9. Remove from table and consider adoption of Resolution amending the Future Land Use Plan of the City Master Plan from Mixed Use to Medium Density Residential for an 8.13 acre, more or less, tract of property, and from Mixed Use to Commercial for a 9.9 acre, more or less, tract of property, both tracts being located near the intersection of Ranch Road 12 and Bishop Street (Weatherford).[7]

25. . . . **NOTE:** *The City Council may adjourn into Executive Session to consider any item listed on this agenda if a matter is raised that is appropriate for Executive Session discussion. An announcement will be made of the basis for the Executive Session discussion. The City Council may also publicly discuss an item listed on the agenda for Executive Session.*

We note initially that the published notice was sufficient to comply with the Act. *See* Tex. Gov't Code Ann. § 551.041; *Cox Enters.*, 706 S.W.2d at 958. Further, Chiu's pronouncement, made prior to the City's Council's closed meeting, on its face satisfied the requirements of the Act. *See* Tex. Gov't Code Ann. § 551.101. However, even if we assume that the City Council violated the Act's closed session and notice provisions, we must still decide whether the City took any "action" that would be voidable. Weatherford complains of the City Council's refusal to allow him to withdraw his second rezoning application. We note, however, that before going into closed session, the City Council voted to table Weatherford's application. Once the Council readjourned after the closed session, it again voted to "withhold final action on the [Weatherford's] pending land use amendment."

Weatherford's Open Meetings complaint fails in several ways. First, the City Council voted to table the approval of Weatherford's second rezoning application *before* it went into closed session and then simply voted again to table the application after the closed session. Further, the

---

[7] This was Weatherford's second rezoning application.

16

action taken by the City Council before and after the closed session was essentially the action Weatherford requested; namely, that the Council not consider his second rezoning application. Finally, even if opinions were expressed by the Council members in the closed session, such expression is not prohibited, as long as the final decision or vote was made in an open session. *See Thompson*, 979 S.W.2d at 685; *see also* Tex. Gov't Code Ann. § 551.102. Therefore, there is no evidence that the City Council took some "final action" that would be voidable under the Act.

The City established that there was no violation of the Act, and we therefore overrule Weatherford's third issue. We also overrule his seventh issue, seeking an injunction to prohibit the City from violating the Act in the future.

## *Proprietary versus Governmental Capacity*

Weatherford next argues that the City acted in a proprietary capacity and not its governmental capacity when it (1) participated in the workshop in 1997, (2) evaluated his applications to develop his property, and (3) enacted the sector plans. As discussed above, the City acted in its governmental capacity in reviewing and evaluating Weatherford's applications. *See City of Round Rock*, 687 S.W.2d at 302-03; *City of Brookside Village*, 633 S.W.2d at 792; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 101.0215(29) (West Supp. 2004) (classifying zoning and planning as governmental functions for purposes of Tort Claims Act); *Truong v. City of Houston*, 99 S.W.3d 204, 210 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (zoning and land-use ordinances and enforcement of ordinances are governmental functions). As a general rule, governmental bodies are not subject to estoppel in the exercise of their governmental capacity. *City of Austin v. Garza*, 124

17

S.W.3d 867, 874 (Tex. App.—Austin 2003, no pet.); *Dillard v. Austin Indep. Sch. Dist.*, 806 S.W.2d 589, 594 (Tex. App.—Austin 1991, writ denied).

We turn, then, to Weatherford's alternative argument—that governmental bodies are subject to estoppel "where justice requires its application." *See City of Hutchins v. Prasifka*, 450 S.W.2d 829, 836 (Tex. 1970). He asserts that he relied on the "conduct and statements of some of the individual defendants, prior city council members and employees of the City in connection with the decision to participate in" the workshop and, after participating in the workshop, spent substantial sums of money on the PDD application process, including time and money spent in filing the applications and then amending them at the City's direction. Consequently, he argues, the City should be estopped from denying or rejecting his PDD applications to the extent they comply with the land uses and densities agreed upon during the workshop. Weatherford argues in the alternative that if he was not entitled to the approval of his PDD applications, he should "recover economic damages incurred in connection with his detrimental reliance."

Weatherford's circumstances do not clearly demand application of the exception "to prevent manifest injustice" as Texas courts have applied it. *See Prasifka*, 450 S.W.2d at 836 (under exception, estoppel may be applied if "there is no interference with the exercise of [the municipality's] governmental functions," and only in exceptional cases where circumstances clearly demand it). Although Weatherford might say he received the "run-around" at various levels of the City's zoning and land-use regulatory process, he cannot, on this basis, bind the City Council in its exercise of ultimate legislative authority over planning and zoning decisions. *See City of Round Rock*, 687 S.W.2d at 302-03; *City of Pharr*, 616 S.W.2d at 175; *City of Farmers Branch v. Hawnco,*

18

*Inc.*, 435 S.W.2d 288, 291-92 (Tex. Civ. App.—Dallas 1968, writ ref'd n.r.e.) (statements by individual council members are not binding on governmental body that can only act in governmental capacity); *see also Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 678 (Tex. 2004) (actions or statements by individual city employees or officials were not considered to have been by the city itself and held not to bind city). We conclude that the City acted in its legislative and governmental capacity and that estoppel is not warranted by any threat of manifest injustice. We overrule Weatherford's fourth issue.

We further note that the individual City Council members are entitled to legislative immunity to the extent they were acting in their legislative capacity. *See In re Perry*, 60 S.W.3d 857, 859-60 (Tex. 2001). Having concluded that the City was acting in its legislative capacity at the time, we conclude that the individual defendants were entitled to governmental immunity and we overrule Weatherford's eighth issue. *See id*.

### Chapter 245 of the Local Government Code

Appellant sought a declaration that his PDD applications, the first filed August 26, 1999, the second July 3, 2000, and the third in December 2000, are "permits" as defined by the local government code. *See* Tex. Loc. Gov't Code Ann. § 245.001(1) (West Supp. 2004-05). He argues on appeal that the City violated chapter 245 of the local government code when it tabled his third PDD application until after the Sector Plan was revised and then denied the application for failure to comply with the Revised Plan.

We discussed whether an application to rezone property is a "permit" within the definition of chapter 481 of the government code, the predecessor of chapter 245, in *Williamson*

*Pointe Venture*, in which we held that rezoning was not a "permit" as defined by statute. *See* 912

S.W.2d at 343 (citing Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 1, 1995 Tex. Gen. Laws 4147,

4147-48 (codified at Tex. Gov't Code §§ 481.141-.143), "inadvertently" repealed by Act of June 1,

1997, 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3943, 3966, reenacted by Act of April

29, 1999, 76th Leg., R.S., ch. 73, §§ 1, 2 1999 Tex. Gen. Laws 431, 432, and recodified at Tex. Loc.

Gov't Code Ann. §§ 245.001-.006 (West Supp. 2004-05)).[8]

A "permit" is a "license, certificate, approval, registration, consent, permit, or other

form of authorization required by law, rule, regulation, or ordinance that a person must obtain to

perform an action or initiate, continue, or complete a project for which the permit is sought." Tex.

Loc. Gov't Code Ann. § 245.001(1); *see Williamson Pointe Venture*, 912 S.W.2d at 343 (quoting

Tex. Gov't Code § 481.142(2)). An application to rezone is not a request for an "approval" or for

some "other form of authorization required by law," and "[t]he proposition that the legislative act

of zoning entitles the landowner to develop his or her property free from all subsequent regulatory

changes is so contrary to established law that the legislature, had it wanted to effect such a change,

must have clearly so stated." *Williamson Pointe Venture*, 912 S.W.2d at 343. An application to

rezone property is not the first of a series of required permits but rather a preliminary step in seeking

---

[8] Weatherford asserts that the case law cited by the City, which is based on chapter 481, is not applicable. Chapter 245 was enacted in 1999 because its predecessor, chapter 481, was "inadvertently" repealed in 1997. *See* Act of April 29, 1999, 76th Leg., R.S., ch. 73, § 1, 1999 Tex. Gen. Laws 431, 432. The relevant portions of chapter 245 are largely identical to their predecessor statutes in chapter 481, and thus, cases discussing chapter 481 are still valid. *Compare* Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 1, 1995 Tex. Gen. Laws 4147, 4147-48 (amending Tex. Gov't Code §§ 481.142 (Definitions), .143 (Uniformity of Requirements)), *with* Tex. Loc. Gov't Code Ann. §§ 245.001 (Definitions), .002 (Uniformity of Requirements).

to develop property.  *Id*.  A municipality may rezone property "to entirely prohibit previously permissible uses, even established uses," and thus can amend regulations or, in this case, master plans, in ways that "affect the prospective development of the property within the broad zoning categories."  *Id*.[9]

Because Weatherford's applications do not come within the definition of "permit," we overrule his fifth issue.

### Regulatory Taking

Weatherford argues that the City's denials of his applications constituted a regulatory taking because they unreasonably interfered with his right to use and enjoy his property,[10] were arbitrary, capricious and unreasonable, and did not advance any legitimate government interest. Weatherford argues that the City's zoning ordinances fail to advance any legitimate government interests only as they were applied to his situation.  In its motion for summary judgment, the City

---

[9] Although we noted in *Williamson Pointe Venture v. City of Austin* that 1995 amendments provided that "preliminary plans and related subdivision plats, site plans, and all other development permits for land covered by such preliminary plans of subdivision plats are considered collectively to be one series of permits," we considered the statute as it read before the amendments and did not decide whether zoning constituted a permit under the amended statute.  912 S.W.2d 340, 345 n.7 (Tex. App.—Austin 1995, no writ).  However, the definition of permit was not amended in 1995, and the definition currently enacted is virtually identical to the definition considered by the court in *Williamson Pointe Venture*.  The 1995 amendments did not change the fact that zoning and rezoning are legislative acts.  *See City of Pharr v. Tippitt*, 616 S.W.2d 173, 176 (Tex. 1981).  As we stated, "[r]ezoning is a step that must be taken before a preliminary plan or subdivision plat can be filed," and a City's decision to "process an application for subdivision only after the property is properly zoned does not make zoning a 'permit.'"  *Williamson Venture Pointe*, 912 S.W.2d at 343.

[10] Weatherford cites *City of Glenn Heights v. Sheffield Development Co.*, 61 S.W.2d 634 (Tex. App.—Waco 2001), in support of his contention that the City unreasonably interfered with his right to use and enjoy his property.  However, that case was recently reversed by the supreme court. *See* 140 S.W.3d 660 (Tex. 2004).

21

argued that the denials of Weatherford's applications did not devalue his property and that the City's decisions substantially advanced its legitimate governmental interests.

The Fifth Amendment of the United States Constitution and article I, section 17 of the Texas Constitution prohibit the government from taking private property for public use without adequate compensation. *Mayhew*, 964 S.W.2d at 933. A regulatory taking may occur if a land-use regulation unreasonably interferes with a landowner's right to use and enjoy his property or does not substantially advance a legitimate governmental interest. *Id*. at 934-35.[11]

*Substantial advancement*

Municipal bodies have discretion to make zoning decisions as long as they comply with constitutional limitations. *Id*. at 933. To satisfy constitutional considerations, a zoning decision or other property regulation must substantially advance a legitimate governmental interest. *Id*. In reviewing a zoning decision, the inquiry is not whether the decision was wise, but whether it substantially advanced some legitimate state interest. *Id*. at 934. A municipality's concern with the "ill effects of urbanization" may justify its action under a takings analysis. *Id*. at 935. The City, along with Weatherford's neighbors, was concerned that commercial development would increase congestion and pollution, change the character of the neighborhood, and negatively affect the overall quality of life for Weatherford's neighbors. Weatherford hoped to add hundreds of living units,

---

[11] A taking may also occur if a zoning decision denies a landowner "all economically viable use of their property," *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 935 (Tex. 1998), but Weatherford does not allege that the City's decision has such an impact on the use of his property. *See also Sheffield*, 140 S.W.3d at 670-72 (suggesting that regulatory takings might be found in situations other than physical effect short of governmental possession, denial of all economically beneficial use, or failure to substantially advance legitimate state interests).

22

many in the form of duplexes, apartments, and townhomes, and to construct a commercial infrastructure. There is no disputing that his proposals could have drastically changed the character of the neighborhood. We therefore conclude that the City showed that its denials of Weatherford's applications substantially advanced a legitimate governmental interest. *See id*. at 935 (proposed development would add 3,600 housing units to rural area with only 2,000 current residents, resulting in population increase of more than 10,000 people; zoning decision held to substantially advance municipality's legitimate interests in "preserving the rate and character of community growth").

*Unreasonable interference with use and enjoyment*

The City's denials of Weatherford's applications could also constitute a taking if they unreasonably interfered with Weatherford's use and enjoyment of his property. *See id*. Determining whether the City unreasonably interfered with the use and enjoyment of Weatherford's property requires a consideration of two factors: (i) the economic impact of the City's decision and (ii) the degree to which the decision interferes with investment-backed expectations. *Id*.

Consideration of the economic impact of the regulation requires a comparison of the value taken from the property with the property's remaining value. *Id*. at 935-36. "The loss of anticipated gains or potential future profits is not usually considered in analyzing this factor." *Id*. The second factor is landowner's investment-backed expectation. *Id*. The property's current permitted uses constitute the landowner's "primary expectation" that may be affected by regulation. *Id*. (quoting *Penn Cent. Transp. v. City of New York*, 438 U.S. 104, 136 (1978)). "Knowledge of existing zoning is to be considered in determining whether the regulation interferes with investment-backed expectations," and historical uses of the property are of critical importance in

23

determining the landowner's reasonable investment expectations. *Id*. at 936-37. Whether a decision so unreasonably restricts a landowner's property rights as to amount to a taking is a question of law, but we rely on the trial court to "resolve disputed facts regarding the extent of the governmental intrusion." *Id*. at 936.

The City noted, and Weatherford has not attempted to prove otherwise, that the Sector II Plan had no effect on the value of Weatherford's property or in the property's underlying zoning designation. At best, Weatherford's argument is that his property would be worth more if he could rezone it. The loss of future profits is not usually considered in our analysis. *Id*.

Further, Weatherford had no "investment-backed expectations" to develop the property when he purchased it. In his affidavit, Weatherford stated, "Although I did not intend to develop the property at the time I purchased it during the 1960s, I did begin to entertain ideas during the 1990s about selling my property for someone else to develop after I started getting inquiries from real estate professionals." The property has been zoned for single-family residences since the 1970s, and Weatherford bought most of his land in 1961 not for investment purposes but for his personal use to build his home. Weatherford admitted that his investment expectations formed well after the property was zoned single-family residential.

We conclude that the City demonstrated that its decisions did not unreasonably interfere with the use and enjoyment of his property and substantially advanced legitimate governmental interests. *See id.* at 938 (landowners bought first tract to use for ranching when no zoning was yet in place and later, after zoning was in place, bought other tracts with development in mind; court held that they lacked reasonable expectation to pursue development under existing

24

state of community and zoning regulations); *see also Sheffield*, 140 S.W.3d at 676-78 (after developer bought land, city rezoned to allow fewer homes per square feet, thus devaluing expected investment return; despite evidence that city "attempted to take unfair advantage of" developer, rezoning did not amount to taking). Further, as discussed above, we conclude that the City established that it did not act in an unreasonable, arbitrary, or capricious manner in making its determinations. Instead, the City took into account the considerable opposition to Weatherford's applications and determined that the interests of the public would be best served by denying his applications. Weatherford has not produced evidence to the contrary. We overrule Weatherford's sixth issue.

## Conclusion

Having overruled Weatherford's issues on appeal, we hold that the district court did not err in granting summary judgment for the City. We affirm the district court's summary judgment.

_____

David Puryear, Justice

Before Justices Kidd, Puryear and Pemberton

Affirmed

Filed: December 9, 2004

25