# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00276-CV

Texas State Board of Public Accountancy and Board Members A. Carlos Barrera,
John W. Dunbar, David D. Duree, James C. Flagg, Dorothy Fowler, Evelyn M. Martinez,
James Pollard, and Catherine Rodewald, Appellants

v.

Carl Bass, Appellee

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
### NO. D-1-GN-09-000051, HONORABLE RHONDA HURLEY, JUDGE PRESIDING

&

## NO. 03-10-00277-CV

Texas State Board of Public Accountancy and Board Members A. Carlos Barrera,
John W. Dunbar, David D. Duree, James C. Flagg, Dorothy Fowler, Evelyn M. Martinez,
James Pollard, and Catherine Rodewald, Appellants

v.

Patricia Grutzmacher, Appellee

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
### NO. D-1-GN-09-000053, HONORABLE RHONDA HURLEY, JUDGE PRESIDING

&

**Texas State Board of Public Accountancy and Board Members A. Carlos Barrera, John W. Dunbar, David D. Duree, James C. Flagg, Dorothy Fowler, Evelyn M. Martinez, James Pollard, and Catherine Rodewald, Appellants**

**v.**

**Thomas Bauer, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT NO. D-1-GN-09-000052, HONORABLE RHONDA HURLEY, JUDGE PRESIDING**

**O P I N I O N**

Carl Bass, Patricia Grutzmacher, and Thomas Bauer (collectively, the "accountants") are former employees of Arthur Andersen LLP. While employed by Andersen, they participated in the 1997 and 1998 audits of Enron Corporation's financial statements. Their work on those Enron audits led to disciplinary actions against them by the Texas State Board of Public Accountancy. This consolidated appeal arises out of their individual suits for judicial review of the Board's orders revoking Bass's and Bauer's professional certificates and suspending Grutzmacher's certificate and license for three years. On cross-motions for summary judgment, the trial court granted summary judgment for the accountants and denied summary judgment for the Board on the accountants' claim that the Board violated the Texas Open Meetings Act ("TOMA" or the "Act"). *See generally* Tex. Gov't Code Ann. §§ 551.001-.146 (West 2004 & Supp. 2011).[1] The trial court held that the Board

---

[1] We cite to the current versions of the statutes and administrative code for convenience because there have been no intervening amendments that are material to our disposition of this appeal.

2

violated the Act and declared the Board's orders sanctioning the accountants void. The trial court also enjoined the Board from re-prosecuting the accountants for the conduct that was the subject of the Board's orders and dismissed the remainder of the accountants' claims as moot. The Board and the Board members (collectively, the "Board") appeal the final judgment, arguing that the trial court should have granted its summary-judgment motion because the evidence established that the Board (1) publicly deliberated and publicly voted on its orders sanctioning the accountants; and (2) called the challenged executive sessions to obtain legal advice on matters subject to the attorney-client privilege, as authorized under the Act. Alternatively, the Board argues that the evidence at least raises a fact question sufficient to defeat the accountants' claim that the executive sessions were not authorized under the Act. The Board also challenges the permanent injunction prohibiting it from taking any further action against the accountants, even if any future prosecution by the Board complied with the Act. We will reverse the trial court's judgment and remand for further proceedings because we find that the accountants failed to establish their TOMA claim.

## BACKGROUND

This case concerns actions taken by the accountants when they audited Enron while working at Andersen.[2] During the time period relevant to the Board's action against them, Bass and

---

[2] Enron, which began as a natural-gas pipeline operator, had transformed itself during the 1990s into a trading and investment conglomerate with a large volume of trading in the energy business. *U.S. v. Arthur Andersen, LLP*, 374 F.3d. 281, 284 (5th Cir. 2004), *rev'd on other grounds*, 544 U.S. 696 (2005). On October 16, 2001, Enron publicly announced that it had incurred a third-quarter loss of $683 million and was taking a non-recurring charge of $1.01 billion, leading to a sharp decline in its stock price. *Newby v. Enron Corp.* 542 F.3d 463, 466 (5th Cir. 2008); *see also* Joel G. Siegel & Jae K. Shim, *Dictionary of Accounting Terms* 299 (3rd ed. 2000) (defining "nonrecurring charge" as "income statement item that is either unusual in nature or infrequent in occurrence"). Shortly after this announcement, the Wall Street Journal published a series of articles

3

Bauer were partners at Andersen and were certified public accountants, and Grutzmacher was a manager at Andersen. Grutzmacher was not a certified public accountant when she worked on the Enron audit, but she became one later. After Enron's collapse, the Board investigated the audits performed by the accountants, and the Board's staff initiated disciplinary action against them.

The accountants participated in a consolidated contested-case hearing before a panel of two administrative law judges ("ALJs") at the State Office of Administrative Hearings ("SOAH"). *See* Tex. Occ. Code Ann. § 901.508 (West 2004) (providing right to hearing for person against whom Board proposes taking disciplinary action); 22 Tex. Admin. Code § 519.40(a) (2011) (Texas State Bd. of Pub. Accountancy, General Provisions) (appointing SOAH as factfinder for Board in contested cases under section 901.508 but explaining that Board retains right to determine sanctions and make final decision in any contested case). The ALJs issued proposals for decision ("PFDs") after the hearing. They concluded that, although the accountants were "able auditors," they had made

---

asserting that Enron and related entities had engaged in various fraudulent transactions. *Newby*, 542 F.3d at 466. On October 31, 2001, the Securities and Exchange Commission ("SEC") began a formal investigation of Enron. *In re Enron Corp. Secs.*, 465 F. Supp. 2d 687, 700 (S.D. Tex. 2006). On November 8, 2001, Enron announced that it would restate its financial statements for 1997, 1998, 1999, and 2000 and the first two quarters of 2001 to include the financial activities of three other entities (Chewco, JEDI, and LJM1) that should have been reported on Enron's consolidated financial statements. *In re Enron Corp. Secs., Deriv. & ERISA Litig.*, 540 F. Supp. 2d 800, 822 & n.23 (S.D. Tex. 2007). Enron filed for bankruptcy on December 2, 2001. *Newby*, 542 F.3d at 466. At that time, Arthur Andersen, LLP, was one of the largest accounting and consulting firms in the world. *Arthur Andersen*, 374 F.3d. at 284. In 2002, the firm was convicted of one felony count of obstructing the SEC's investigation into the collapse of Enron, which effectively put the firm out of business. *See id.*; *see also* Christopher A. Wray & Robert K. Hur, *Corporate Criminal Prosection in a Post-Enron World: The Thompson Memo in Theory and Practice*, 43 Am. Crim. L. Rev. 1095, 1097 (2006) (noting that Andersen's conviction effectively destroyed it and turned accounting's "Big 5" into "Big 4").

serious mistakes in professional judgment that contributed to the material misstatements in Enron's 1997 and 1998 financial statements and to the subsequent need to restate those financial statements.

The ALJs found that Bass and Bauer violated and that Grutzmacher failed to conform her conduct to a number of generally accepted auditing standards and accounting principles, which the Board has adopted as professional standards. We will briefly summarize some of the ALJs' findings and conclusions to provide context for the Board's decision to sanction the accountants. Much of the discussion in the PFDs focused on the accountants' review of a transaction that involved Enron's entering into a partnership called JEDI with a company called Chewco. JEDI was an investment vehicle for an Enron division called Enron Capital & Trade. Enron had previously partnered with an outside company in JEDI, which had allowed it to treat JEDI as a nonconsolidated entity for accounting purposes, also known as an "off-balance-sheet entity," meaning that its losses could be kept off Enron's financial statements. When the outside company withdrew from JEDI, Enron decided to form Chewco to be its partner in JEDI. To maintain JEDI's status as a nonconsolidated entity, it was imperative that Chewco achieve and maintain "special purpose entity" ("SPE") status, which required that (1) at least three percent (3%) of its equity be owned by an entity that was independent of Enron and (2) the outside equity investment retain substantive risks and rewards of ownership for the life of the SPE (i.e., the outside equity must remain at risk and not be supported by a letter of credit or other form of guaranty on the investment). The ALJs found that "Chewco's SPE status was material to Enron's financial statements because even a one-dollar reduction of Chewco's independent equity at risk below the required 3% would cause a material misstatement in the financial statements." It is undisputed that Chewco did not in fact have the

5

required 3% independent equity at risk to qualify for off-balance-sheet treatment in 1997 and 1998. Ultimately, in 2001, when Bauer saw for the first time a side agreement that clearly showed Chewco did not qualify as an SPE, he informed Enron management that the financial statements for 1997 and 1998 had to be restated because both Chewco and JEDI had to be consolidated with Enron for both years.

One crucial error leading to the material misstatements occurred when the accountants violated and failed to conform to professional standards when verifying whether Enron had properly treated JEDI and Chewco as off-balance-sheet entities. In essence, the ALJs found that the accountants placed too much reliance on uncorroborated management representations concerning the unavailability of Chewco's formation documents and its structure, ownership, and financing.[3] The ALJs also found that Bauer and Bass violated standards related to their design and supervision of the audits, that they failed to properly assess Chewco's materiality, and that they failed to discharge their duty to audit for any transactions that would adversely affect Chewco's status as an SPE. The ALJs determined that (1) Bauer and Grutzmacher did not have sufficient competent evidence to conclude that Chewco's 3% equity was independent or at risk in 1997 or 1998, and (2) the accountants had access to documents that contained information pertinent to the audit of Chewco's SPE status and that provided evidence that Chewco lacked 3% independent equity at risk. Moreover, the ALJs concluded that any collusive fraud by Enron's management, employees, or third parties was not the primary cause of the auditors' failure to conform to the professional standards.

---

[3] The PFDs describe in detail the ALJs' findings and conclusions about the varying levels of responsibility and errors on the part of each of the accountants.

Despite these findings, the ALJs recommended that Bass and Bauer should be allowed to continue practicing public accountancy. The only sanctions that they recommended were that Bass and Bauer be admonished and pay an administrative penalty and costs. The ALJs recommended that all charges against Grutzmacher be dismissed because they concluded that (1) Grutzmacher was not subject to discipline by the Board in 1997 and 1998 when the audits were performed since she was not licensed at that time, and (2) she was fit to hold a certificate and license under section 901.502 of the occupations code. *See* Tex. Occ. Code Ann. §§ 901.501 (establishing Board's disciplinary powers), .502(11) (West 2004) (providing that Board "may discipline a person under Section 901.501 for . . . conduct indicating lack of fitness to serve the public as a professional accountant").

The Board met four times to consider the PFDs before making its final decision in the cases. The Board's rules require that "[a]ll final decisions and orders shall be made during a public meeting duly noticed" as required by the Act. 22 Tex. Admin. Code § 519.72(a) (2011) (Texas State Bd. of Pub. Accountancy, Final Decisions & Orders). Any party to the contested-case hearing may request oral argument before the Board makes its final determination. *Id.* § 519.71(d) (2011) (Texas State Bd. of Pub. Accountancy, Exceptions & Replies). Each of the four meetings was a public meeting, and the accountants' counsel and the Board's litigation counsel presented oral argument at all of the meetings. At each of the meetings, the Board went into executive session—i.e., a closed meeting—to meet privately with its counsel, invoking TOMA section 551.071 and stating that the Board would be seeking its counsel's advice on matters subject to the attorney-client privilege. Tex. Gov't Code Ann. § 551.071 (West 2004) (allowing governmental body to consult privately with its attorney in certain situations).

7

During the last two meetings, the Board publicly considered the PFDs. The Board debated what type of sanctions to impose on the accountants and whether it had jurisdiction over Grutzmacher during the third meeting. It publicly voted to revoke Bauer's and Bass's licenses and to suspend Grutzmacher's license for three years. It directed its counsel to prepare draft orders for its approval at the next open meeting. At the final meeting, the Board's counsel publicly explained the draft orders that she had prepared based on the Board's directions, which the Board had given publicly at the prior meeting. The Board publicly discussed the proposed orders, heard oral argument from both sides again, began discussing the cases of two accountants who are not parties to this case, and had a final executive session to receive legal advice from its counsel. After the executive session, the Board returned to the public session and discussed the two non-parties' cases. After deciding how to handle those two cases, the Board again discussed the final revisions to the draft orders for Bass, Bauer, and Grutzmacher. It then publicly voted to accept each revised order.

Although the Board adopted most of the findings and conclusions proposed by the ALJs, the Board disagreed with the ALJs' finding that Grutzmacher was qualified to practice public accountancy despite the audit errors and with the ALJs' conclusion that the Board had no jurisdiction over Grutzmacher's prelicensure conduct. *See id.* § 2001.058(e)(1) (West 2008) (allowing agency to change finding or conclusion made by ALJ or to modify ALJ's order if agency determines ALJ did not properly apply or interpret applicable law, agency rules, or prior administrative decisions); *see also* 22 Tex. Admin. Code §§ 519.40(a), .72(f) (providing that Board shall make final decision in all disciplinary matters, including assessment of sanctions). The Board determined that the ALJs "failed to apply or interpret applicable law, rules, and policy" when determining Grutzmacher's

8

fitness to practice and recommending an appropriate sanction for her prelicensure conduct. Similarly, the Board determined that, contrary to the ALJs' conclusions in the PFD, the ALJs' findings supported the imposition of discipline on Bauer and Bass. The Board decided the ALJs' conclusion that discipline was not needed to deter further violations was a misapplication of applicable law, rules, and policy.[4]

In all three orders, the Board stated the specific reasons and legal basis for the modifications that it made, noting that it did so to comply with government code section 2001.058(e). *See* Tex. Gov't Code Ann. § 2001.058(e) (requiring agency to state in writing reason and legal basis for changes made to ALJ's findings and conclusions). It also explained in all three orders that its purpose is to protect the public interest and to ensure that the public can rely on the attest services provided by certified public accountants for assurance that the management of commercial entities has reasonably described those entities' financial status.[5] *See* Tex. Occ. Code Ann. § 901.005(b) (West 2004); 22 Tex. Admin. Code § 501.51 (2011) (Texas State Bd. of Pub. Accountancy, Preamble and General Principles). In addition, the Board noted that the soundness and reliability

_____

[4] In each of the three orders, the Board also deleted findings of fact and conclusions of law concerning related-party transactions because "it determined that the [ALJs] failed to properly apply or interpret applicable law, rules, and policy in determining [this] issue." The Board noted that its order as issued did not impose sanctions based upon the omitted findings and conclusions, which were thus immaterial and unnecessary to its determinations against the accountants, citing *Sanchez v. Texas State Board of Medical Examiners*, 229 S.W.3d 498 (Tex. App.—Austin 2007, no pet.).

[5] The occupations code defines "attest service" as "an audit or other engagement required by the board to be performed in accordance with the auditing standards adopted by the American Institute of Certified Public Accountants [AICPA] or another national accountancy organization recognized by the board," as well as other engagements or assurance services that the Board requires to be performed in accordance with standards for accounting and review services, attestation engagements, or professional standards adopted by AICPA or another national organization. Tex. Occ. Code Ann. § 901.002(1)(A) (West Supp. 2011); *see also id.* § 901.002(1)(B)-(D).

9

of the financial system and the strength of the economy and the public markets depend upon the competence, integrity, and expertise of the certified public accountants who attest to financial statements in Texas. Tex. Occ. Code Ann. § 901.005(b). In both the Bauer and Bass orders, the Board explained its view that the ALJs failed to properly apply the law because the ALJs' recommended sanction was not consistent with their findings that both accountants had a high level of responsibility and had committed serious violations—especially considering that Andersen itself had assessed the audit as being a high-risk audit. Based on these determinations, the Board revoked Bass's and Bauer's professional certificates and imposed administrative costs and monetary penalties against them. *See id.* § 901.501(a)(1), (9), (11) (establishing Board's power to take these disciplinary actions). In Grutzmacher's case, the Board determined that the ALJs' findings about her conduct and her attest services during the audit supported the conclusion that she engaged in conduct indicating lack of fitness to serve the public as a professional accountant. Based on its determinations, the Board suspended Grutzmacher's certificate and license for three years but probated the penalty, explaining that "protection of the public interest demands the type of scrutiny, accountability, and deterrent effect that a three-year probated suspension can provide." *See id.* § 901.501(a)(2) (establishing Board's power to suspend certificate and license).

After the Board issued its orders, the accountants filed a joint motion for rehearing. The Board overruled the motion, and each of the accountants subsequently filed a suit for judicial review under the administrative procedure act. *See* Tex. Gov't Code Ann. § 2001.174 (West 2008) (establishing that scope of review is substantial-evidence review); *see also* Tex. Occ. Code Ann. § 901.556(a) (West 2004) (allowing appeal of Board decision). The suits for judicial review

10

included a TOMA claim in which the accountants asserted that the Board violated the Act by deliberating on the merits of the PFDs "almost exclusively" in "lengthy closed sessions" and immediately voting during the open session "to cast the SOAH decision aside without any meaningful discussion." The accountants contended that "these improper deliberations" rendered the Board's final orders void because "[a]ny action taken as a result of the improper closed session is voidable and should be considered void" under TOMA section 551.141. *See* Tex. Gov't Code Ann. §§ 551.002 (requiring governmental body's meetings to be open except as provided by Act), .141 (establishing that action taken by governmental body in violation of Act is voidable), .142 (West 2004) (allowing interested person to bring mandamus or injunction action to prevent or reverse violation).

Both sides filed traditional motions for partial summary judgment on the accountants' TOMA claim. In their motion, the accountants asserted that the Board conducted "illegal secret deliberations regarding its decision on [the accountants'] contested cases" at each of the four public meetings by entering into executive sessions to consult with its counsel, actually decided the accountants' cases during the final executive session, and could not prove any affirmative defense involving an exception to the Act. In particular, the accountants asserted that the attorney-consultation exception provided by section 551.071 of the Act did not apply to the Board's executive sessions. *See id.* § 551.071. The accountants alleged that the "impermissible, secret deliberations" and the Board's alleged decision on the case in executive session were separate violations of the Act. The accountants requested that the trial court find that the Board's orders were incurably void and prohibit the Board from taking further action against the accountants because the "illegal, secret

11

deliberations ha[d] forever tainted the Board's ability to render a valid order in this case." The Board contended in its motion that (1) all of the challenged executive sessions were lawful under TOMA section 551.071, (2) it deliberated and voted in open session, and (3) the accountants had no viable claim for injunctive or mandamus relief against the individual Board members.

In its final judgment granting the accountants' motion for partial summary judgment and denying the Board's motion, the trial court stated that it found "as a matter of law [the Board] violated the Open Meetings Act." Based on that finding, the trial court reversed the Board's action and declared the three orders sanctioning the accountants to be void. The trial court also "restrained and enjoined [the Board] from re-prosecuting the [accountants] for the alleged violations that were the subject of the underlying contested-case proceedings that resulted in the orders" sanctioning the accountants. The trial court dismissed the remaining claims brought by the accountants as moot and denied all relief not expressly granted in the final judgment. The Board appeals.

## DISCUSSION

In two issues, the Board challenges the trial court's denial of its summary-judgment motion and grant of the accountants' summary-judgment motion. In its first issue, the Board contends that the trial court should have granted its summary-judgment motion because the evidence established that the Board (1) publicly deliberated about the substance of the PFDs and publicly voted on changes to them at its third and fourth meetings and (2) called the challenged executive sessions to obtain legal advice on matters subject to the attorney-client privilege, as authorized under section 551.071 of the Act. In its second issue, the Board challenges the trial court's decision to

12

permanently enjoin the Board from taking any further action against the accountants based on the violations found by the ALJs, even if any future prosecution by the Board complied with the Act.

The accountants asserted in their summary-judgment motion and continue to assert on appeal that the Board's allegedly illegal deliberations and its alleged secret vote tainted its final orders and rendered them incurably void. We will consider whether the accountants' allegations provided a sufficient basis for the trial court to declare the Board's orders void. As our analysis below will demonstrate, the dispositive question is whether the accountants established that the Board's final orders were actions taken in violation of the Act and thus voidable.

**Standard of review**

We review the trial court's summary judgment de novo, taking as true all evidence favorable to the nonmovant and indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). Summary judgment is proper when the evidence shows that there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). Movants, like the accountants, who seek traditional summary judgment on their own claim, have the initial burden of establishing their entitlement to judgment as a matter of law by conclusively establishing each element of that claim. *See MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986) (per curiam). If the movant establishes the right to summary judgment, the burden shifts to the nonmovant to raise a fact issue by introducing controverting evidence of probative force. *Olympic Waste Servs. v. City of Grand Saline*, 204 S.W.3d 496, 501 (Tex. App.—Tyler 2006, no pet.). A movant, like the Board, that seeks traditional summary judgment against another party's claim, must conclusively negate at

13

least one element of that claim or conclusively establish each element of an affirmative defense. *See Shah v. Moss*, 67 S.W.3d 836, 842 (Tex. 2001); *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). If the movant meets this burden, the burden shifts to the nonmovant to raise a genuine issue of material fact on the negated element or affirmative defense to preclude summary judgment. *Centeq Realty*, 899 S.W.2d at 197.

When both sides move for summary judgment, each party must carry its own burden, and neither party can prevail because of the other's failure to discharge its burden. *Olympic Waste*, 204 S.W.3d at 501. When the trial court grants one motion and denies the other, we consider both sides' summary-judgment evidence. *Valence Operating Co.*, 164 S.W.3d at 661. If we determine that the trial court erred, we render the judgment that the trial court should have rendered. *Id.* If we determine that a fact issue precludes summary judgment for either party, we remand the claim for trial. *See University of Tex. Health Sci. Ctr. at Houston v. Big Train Carpet of El Campo, Inc.*, 739 S.W.2d 792, 792 (Tex. 1987) (per curiam).

**The accountants' TOMA claim**

In its first issue, the Board asserts that it, not the accountants, was entitled to summary judgment on the accountants' TOMA claim. To provide context for the issues raised by the parties, we will briefly explain the Act's purposes and structure.

Meetings of governmental bodies generally must be open to the public. *See* Tex. Gov't Code Ann. § 551.002. The Act's purposes are to provide public access to and increase public knowledge of governmental decision-making. *City of San Antonio v. Fourth Ct. of Appeals*, 820 S.W.2d 762, 765 (Tex. 1991). The intended beneficiaries of the Act are members of the interested

14

public, not individual citizens such as the accountants in this case. *See id.* (noting that Act has no due-process implications). The law requires openness, not secrecy, when a state agency makes its decision in a contested administrative case, but there are certain narrow exceptions to that rule, one of which is provided by section 551.071. *See Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 299-300 (Tex. 1990).

The Act provides that "[e]very regular, special, or called meeting of a governmental body shall be open to the public, except as provided by this chapter." Tex. Gov't Code Ann. § 551.002. Section 551.071 of the Act expressly authorizes certain closed sessions and provides that:

> A governmental body may not conduct a private consultation with its attorney except:
>
> (1)    when the governmental body seeks the advice of its attorney about:
>
> (A) pending or contemplated litigation; or
>
> (B) a settlement offer; or
>
> (2)    on a matter in which the duty of the attorney to the governmental body under the Texas Disciplinary Rules of Professional Conduct of the State Bar of Texas clearly conflicts with this chapter.

*Id.* § 551.071. This attorney-consultation exception incorporates the attorney-client privilege, i.e., an attorney's duty to preserve the confidences of a client. *See Killam Ranch Props., Ltd. v. Webb Cnty.*, ___ S.W.3d ___ , No. 04-10-00324-CV, 2012 WL 1193722, at *8 (Tex. App.—San Antonio April 11, 2012, no pet. h.); *Olympic Waste*, 204 S.W.3d at 502; *see also* Tex. Att'y Gen. Op. No. JC-0233 (2000). A governmental body may not engage in a general discussion of policy unrelated to legal matters in a closed session merely because its counsel is present, but it may hold an executive

15

session to seek or receive its attorney's advice about either matters related to a specific pending or contemplated legal proceeding or matters for which it seeks the attorney's legal advice. Tex. Att'y Gen. Op. No. JC-0233 (2000) (citing Tex. Att'y Gen. Op. No. JM-100 (1983)). "[T]he communication must be related to an opinion on law or legal services or assistance in some legal proceeding." Tex. Att'y Gen. Op. No. JM-100 (1983).

When conducting a closed meeting, a quorum of the governmental body must first convene in an open meeting for which proper notice has been given. Tex. Gov't Code Ann. § 551.101 (West 2004). The presiding officer must publicly announce that a closed meeting will be held and identify the section or sections of the Act under which the closed meeting is held. *Id.* A final action, decision, or vote on a matter upon which the governmental body deliberates in a closed meeting may only be made in an open meeting that complies with the Act's notice provisions. *Id.* § 551.102 (West 2004).

The Act provides several different enforcement mechanisms and remedies. *See generally id.* §§ 551.141-46 (West 2004). "An action taken by a governmental body" that violates the Act is voidable. *Id.* § 551.141. The Act also allows "[a]n interested person . . . [to] bring an action by mandamus or injunction to stop, prevent, or reverse a violation or threatened violation of this chapter by members of a governmental body." *Id.* § 551.142. In addition, the Act establishes criminal penalties for certain conduct, including conspiring to circumvent the Act, knowingly participating in a closed meeting not permitted under the Act or in a closed meeting in which a

16

certified agenda is not being kept or a tape recording being made if required, or knowingly disclosing

to the public the certified agenda or tape recording of a lawfully closed meeting.[6]  *Id.* §§ 551.143-46.

### *The parties' summary-judgment burdens*

The parties dispute the elements that each is required to prove to demonstrate their

entitlement to summary judgment.  The accountants assert that they need only prove that the Board

conducted a closed meeting and then the Board must prove that the closed meeting was authorized

by one of TOMA's exceptions.  The Board takes the position that the accountants, to prove a claim

under section 551.002, must conclusively establish that the Board (1) conducted a closed session

(2) that was not authorized by one of TOMA's exceptions.  Both sides misstate the elements required

to establish a TOMA claim seeking to void a governmental body's action.

In this case, the accountants sought summary judgment "finding the Board's orders

in their cases incurably void."[7]  Section 551.141 of the Act establishes that an action taken in violation

of the Act is voidable.[8]  *See id.* § 551.141.  Consequently, to successfully move for summary judgment,

in addition to proving that the Board met in a closed session, the accountants also had to

conclusively prove that the Board's final orders were actions that violated the Act and thus were

voidable.  *See Weatherford v. City of San Marcos*, 157 S.W.3d 473, 485-86 (Tex. App.—Austin

---

[6] A governmental body is not required to keep a certified agenda or make a tape recording of the proceedings of a closed meeting permitted under the attorney-consultation exception provided by section 551.071.  Tex. Gov't Code Ann. § 551.103(a) (West 2004).

[7] The accountants also sought an injunction against any future action by the Board against the accountants—even TOMA-compliant future action—which the trial court granted.  The Board challenges the appropriateness of this injunction in its second issue.

[8] The trial court stated in its order that it was reversing the Board's action and declaring the Board's orders void because the Board violated the Act.

2004, pet. denied) (holding vote taken in open session not rendered voidable by closed session); *see also* Tex. Gov't Code Ann. § 551.102 (providing that "a final action, decision, or vote on a matter deliberated in a closed meeting under this chapter may only be made in an open meeting" that complies with Act). To defeat the Board's motion, the accountants had to present evidence raising a material fact issue on any element of their claim that the Board negated. Conversely, to defeat the accountants' summary-judgment motion, the Board had to at least raise a fact issue related to an element of the accountants' claim; to successfully move for summary judgment, it had to conclusively negate an element of the accountants' claim.[9]

### *The need to prove a voidable "action" taken in violation of the Act*

We now consider whether the accountants were entitled to summary judgment based on their motion. There is no dispute that the closed sessions occurred; the only question is whether the accountants conclusively established the remaining essential element of their claim—that the

---

[9] The statutory attorney-consultation exception is an affirmative defense for which the Board bears the burden of proof. *See Killam Ranch Props., Ltd. v. Webb Cnty.*, ___ S.W.3d ___ , No. 04-10-00324-CV, 2012 WL 1193722, at *8 (Tex. App.—San Antonio April 11, 2012, no pet. h.); *City of Farmers Branch v. Ramos*, 235 S.W.3d 462, 466 (Tex. App.—Dallas 2007, no pet.); *Olympic Waste Servs. v. City of Grand Saline*, 204 S.W.3d 496, 504 (Tex. App.—Tyler 2006, no pet.). Thus, the Board also could have defeated the accountants' summary-judgment motion by raising a fact issue concerning the statutory exception or could have successfully moved for summary judgment by establishing each element of its affirmative defense. And the accountants, after they established the elements of their TOMA claim, could have defeated the Board's motion by presenting evidence raising a material fact issue on the Board's statutory-exception affirmative defense. In this case, although both sides contest whether the Board's executive sessions were authorized under the attorney-consultation exception, as previously mentioned, the dispositive issue is whether the accountants established as a matter of law that the Board's final orders were actions that violated the Act and thus were voidable. As a result, we need not examine the Board's authority to call the executive sessions. *See* Tex. R. App. P. 47.1. Therefore, we will examine only whether the accountants established as a matter of law that the Board's orders were actions violating the Act and whether the Board conclusively negated that element of the accountants' claim.

18

Board's final orders sanctioning the accountants were actions taken in violation of the Act and thus voidable.

The assumption underlying the accountants' summary-judgment argument is that if the Board's closed sessions were not proper under the Act, then any subsequent action by the Board was voidable. As a result, the accountants focus much of their argument on whether the closed-meeting deliberations were "illegal" because the closed meetings did not satisfy the requirements of the attorney-consultation exception or because the Board exceeded the scope of any permissible consultation with its counsel. The accountants' assumption is incorrect—proving that a meeting violated the Act does not necessarily render voidable all related subsequent actions by a governmental body. The Act provides a basis for voiding "*specific* acts which violate [TOMA]." *Point Isabel Indep. Sch. Dist. v. Hinojosa*, 797 S.W.2d 176, 182 (Tex. App.—Corpus Christi 1990, writ denied) (emphasis added) (holding that only those actions taken in connection with defective portions of meeting notice were voidable). It does not, however, render voidable either defective meetings, *see id.*, or publicly made decisions that occur after closed-meeting deliberations, *see, e.g.*, *Burks v. Yarbrough*, 157 S.W.3d 876, 882 (Tex. App.—Houston [14th Dist.] 2005, orig. proceeding [mand. denied]) (holding allegedly improper closed meeting did not provide basis to void subsequent payments that had been authorized at duly noticed meetings); *Weatherford*, 157 S.W.3d at 486. The accountants asked the trial court to void the Board's orders, which means that they must establish that the orders themselves were actions taken in violation of the Act and thus voidable. *See Weatherford*, 157 S.W.3d at 486 ("[E]ven if we assume that the City Council violated the Act's

19

closed session and notice provisions, we must still decide whether the City took any 'action' that would be voidable.").

Section 551.102 provides that: "A final action, decision, or vote on a matter deliberated in a closed meeting under this chapter may only be made in an open meeting that is held in compliance with the notice provisions of this chapter." Tex. Gov't Code Ann. § 551.102. Thus, the statute contemplates that some deliberations may occur in executive session, but establishes that the final resolution of a matter must occur in open session. *Board of Trs. v. Cox Enters., Inc.*, 679 S.W.2d 86, 89 (Tex. App.—Texarkana 1984) (holding that Act "requires that the actual resolution of an ultimate issue confronting a public body be made in public"), *rev'd in part on other grounds*, 706 S.W.2d 956 (Tex. 1986). TOMA "does not prohibit [the Board] members in an executive session from expressing their opinions on an issue or announcing how they expect to vote on the issue in the open meeting, so long as the actual vote or decision is made in the open session." *Id.*; *see also, e.g.*, *Weatherford*, 157 S.W.3d at 485. Thus, to establish that the Board's orders violated the Act, the accountants must establish that "the actual vote or decision" to adopt the orders was not made in open session.[10]

---

[10] Although a group could defeat the Act's purpose by expressing their opinions in a closed session and then confirming the majority position by unanimous vote in the open session, this potential difficulty in enforcement does not change our interpretation of the statute when its meaning can be ascertained. *Board of Trs. v. Cox Enters., Inc.*, 679 S.W.2d 86, 89 n.4 (Tex. App.—Texarkana 1984), *rev'd in part on other grounds*, 706 S.W.2d 956 (Tex. 1986). Furthermore, if a governmental body engaged in this practice, it would usually be detected. *Id.* Preventing a governmental body's members from expressing their opinions on an issue, including how they expect to vote, would unreasonably limit governmental bodies from permissible deliberations in executive sessions. *Id.* at 89. The Act's purposes of allowing public access to and public knowledge of governmental decision-making are fully served by requiring the "actual resolution of an ultimate issue" to be made in public. *Id.*

The accountants relied on transcripts of the four meetings to establish that the Board went into executive sessions at each meeting in violation of the Act "and deliberated [upon] and ultimately decided [the accountants'] cases in executive session." The transcripts also contain the public discussions that the Board had at each meeting. The accountants do not allege that the Board's final action, decision, or vote occurred during the closed sessions at the first three meetings. Although the accountants assert that "illegal deliberations" occurred, they did not seek to void any decisions made at these meetings. They sought only to void the Board's final orders. As explained above, allegations of improper closed deliberations alone do not provide a sufficient basis for voiding all subsequent related actions. *See, e.g.*, *Olympic Waste*, 204 S.W.3d at 504 (holding closed session that violated Act did not render contract voidable when vote awarding contract occurred in open session after violation occurred); *Burks*, 157 S.W.3d at 882. As a result, these meetings are relevant to our decision only to the extent that they demonstrate the scope of public consideration that the Board gave to the accountants' cases.

At the first two meetings, the Board primarily heard oral argument.[11] The transcript from the third meeting shows that the Board went into executive session shortly after convening the public meeting. After a 45-minute closed session, the Board returned to open session, heard oral argument from both sides (lasting fifteen minutes per side), and then publicly discussed each

___

[11] None of the actions taken at the first two meetings constituted "[a] final action, decision, or vote." Tex. Gov't Code Ann. § 551.102 (West 2004). At the first meeting, the Board decided to postpone decision on the case and to request additional briefing from the parties. At the second meeting, the Board decided to remand Bauer's case to SOAH to consider new evidence of an order issued by the SEC suspending his privilege to practice in front of the SEC for three years and to abate the other cases until the issue of the new evidence against Bauer was resolved.

21

accountant's case individually. The open session of the meeting lasted two and a half hours. For Bauer, the Board members debated at length whether license revocation or suspension would be a more appropriate sanction.[12] They also discussed the reasons why a majority of the Board members believed that the ALJs' suggested sanction was inconsistent with both a proper interpretation of the law and the Board's regulations. They then publicly voted to revoke Bauer's license. For Bass, the Board conducted a similar discussion and also had a lengthy discussion about whether his position on the audit carried the same level of responsibility as Bauer's did and thus should result in the same sanction.[13] After deliberating, the Board publicly voted to revoke Bass's license. For Grutzmacher, the Board members discussed her level of experience, whether she may have been put into a position on the audit by Andersen that she should not have been, the policy reasons for the Board's conclusion that it could consider Grutzmacher's prelicensure violations and fitness to practice when determining a sanction, and the appropriate sanction. The Board then publicly voted to sanction Grutzmacher with a probated three-year license suspension. All eight of the Board members actively participated in these discussions. The extensive debate among the Board members that occurred after the executive session and oral argument is conclusive evidence showing that the Board members had not already made final decisions regarding the contested cases in the closed session.[14]

---

[12] For example, they discussed whether Bauer could still perform tax work if his license was revoked and what the process was for applying for reinstatement of a revoked license. They also debated what effect the mitigating factors that the ALJs included in the PFDs should have on their decision about what sanctions to impose.

[13] They continued to discuss whether suspension was actually a more severe sanction than revocation as part of their discussion about whether Bauer and Bass should receive the same sanction.

[14] The accountants did not assert that the Board made its final decisions concerning the accountants' cases in the executive session that occurred during the third meeting. And although the

22

At the beginning of the fourth meeting, the acting chairman of the Board stated that the Board was meeting to help its counsel finish drafting the orders that she had prepared based on the Board's directions to her at the third meeting. The Board's counsel agreed, stating that it was important for the Board to articulate in its orders its reasoning and legal basis for any changes being made to the PFDs, as required by section 2001.058(e) of the administrative procedure act. The Board's counsel then spoke about the draft orders that she had prepared and verbally covered each section of each order with the Board. As they publicly discussed each section of each order, the Board's counsel asked the Board members to let her know if the language in the order accurately reflected their directions or if changes needed to be made or additional information about their decision-making process needed to be added. The Board members participated in discussions about various aspects of the three orders. At the accountants' counsel's request, the Board then allowed each side to speak for three minutes before continuing its deliberations on orders for two accountants who are not parties to this case. The Board went into executive session to get legal advice from its counsel about sanctions for those two non-parties. When they returned to open session, the Board picked up the discussion about the two non-party accountants. After that discussion concluded, the Board's counsel went over the changes that she was making on the Bauer, Bass, and Grutzamacher orders based on the Board's previously given public guidance, so that the Board members could

Board voted at this meeting to impose different sanctions on the accountants than those recommended by the ALJs, this vote was not "[a] *final* action, decision or vote" because the Board's discussion of the cases continued at the fourth meeting and another vote was taken before the final language of the orders was approved. *Id.* (emphasis added); *see also Cox Enters., Inc.*, 679 S.W.2d at 89 (concluding Act requires actual resolution of ultimate issue confronting public body to occur at public meeting).

23

confirm that the orders were drafted as they wanted before a vote was taken on them. After some additional public discussion and changes on each order, the Board publicly voted on the orders.

The accountants contend that the Board's counsel's comments to the Board show that the Board used the open session only to ratify the Board members' "secret straw poll." The accountants focus in particular on the Board's counsel's comments at the fourth meeting, asserting that her comments reflected what the Board had decided in executive session. They also state that "the Board never publicly made any decisions regarding any aspect of its orders in [the accountants'] cases prior to retreating into executive session," citing the transcript from the fourth meeting and ignoring the events of the third meeting. In fact, the transcript reflects that the Board made public decisions about its orders at the third meeting immediately after extensive public deliberations, publicly directed its counsel to draft orders reflecting those decisions, returned for the fourth meeting to publicly discuss those drafts and changes that the Board decided in open session to make to them, and then publicly voted on the final version of each of those drafts.

The Board's public votes on the orders mandate summary judgment for the Board and against the accountants on the TOMA-violation claim. The Board's public deliberations leading up to its public final decision were substantive and extensive. Speculation about the Board's communications with its counsel is not summary-judgment evidence. Even if we assume, arguendo, that the Board's executive sessions either were not protected by the attorney-consultation exception or exceeded the scope of permissible attorney consultation, the Board's public votes on the orders satisfy the Act's requirement that "a final action, decision, or vote on a matter deliberated in a closed

24

meeting under this chapter may only be made in an open meeting," and thus, the orders are not voidable. *See Olympic Waste*, 204 S.W.3d at 504 (holding that while discussion of merits of proposed contract in executive session with legal counsel violated TOMA, open-session vote to award contract did not violate TOMA and contract was not voidable); *Weatherford*, 157 S.W.3d at 486 (holding even if council members expressed opinions in closed session and closed session with counsel violated Act's exception and notice provisions, final vote occurred in open session and no voidable final action was taken); *United Indep. Sch. Dist. v. Gonzalez*, 911 S.W.2d 118, 128 (Tex. App.—San Antonio 1995, writ denied) (op. on reh'g) (holding no TOMA violation when vote took place in open session after any alleged violation in closed session occurred). Consequently, the accountants did not establish the essential element of their TOMA claim of a voidable final action, and they were not entitled to summary judgment. Instead, the Board has conclusively negated this essential element of the accountants' TOMA claim. Accordingly, we reverse the trial court's order and render partial summary judgment in favor of the Board, concluding as a matter of law that the accountants take nothing by their TOMA claim.

We also reverse (1) the portion of the trial court's order reversing the Board's action and declaring the Board's orders void and (2) the trial court's permanent injunction restraining the Board from re-prosecuting the accountants for the alleged misconduct that was the subject of the orders. Under the Act, a trial court may grant an injunction to stop, prevent, or reverse a violation or threatened violation; we have determined that the accountants' allegations of improper deliberations that "forever tainted the Board's ability to render a valid order in this case" did not

25

establish that a voidable—i.e., reversible—violation occurred.[15] Nor is there evidence in the record of any ongoing or prospective conduct that supports the need for a permanent injunction to stop or prevent a violation or threatened violation.

Finally, as a result of our reversal of the trial court's order declaring the Board's orders void, the remainder of the accountants' claims are no longer moot. We will remand the case to the trial court for consideration of those claims.

## CONCLUSION

Having determined that the trial court erred by granting the accountants' motion for summary judgment, permanently enjoining the Board from further proceedings against the accountants, and denying the Board's motion for summary judgment, we reverse those portions of the judgment.[16] We render summary judgment for the Board on the accountants' TOMA claim, and we remand the remainder of the case to the trial court for further proceedings consistent with this opinion. *See* Tex. R. App. P. 43.2(d).

---

[15] Although we are reversing the injunction based on our holding that no reversible violation occurred in the Board's vote to sanction the accountants, we do not reach the merits of the Board's second issue challenging the appropriateness of the permanent injunction against future TOMA-compliant proceedings as a remedy for the Board's past actions allegedly taken in violation of the Act. This is because we have determined that the accountants did not conclusively prove that the Board took actions that violated the Act. Similarly, as previously noted, we need not address the parties' arguments about the applicability of the statutory legal-consultation exception because the burden does not fall upon the Board to prove this affirmative defense until the accountants establish the elements of their claim, which they did not. *See* Tex. R. App. P. 47.1 (court of appeals must hand down written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of appeal).

[16] We do not address the portion of the judgment sustaining the Board's objection to and motion to strike the affidavit of Jennifer Riggs because the accountants did not challenge that decision on appeal.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton and Rose

Reversed and Rendered in part; Reversed and Remanded in part

Filed:   February 24, 2012

27